Good morning, and may it please the court. My name is Brian Maxey, Assistant City Attorney, and with Dominique Ginhong, we represent the City of Seattle and Seattle Police Officer Jonathan Chin. Today, I intend to focus on the issue of qualified immunity and why the officer's actions in this case were objectively reasonable under the totality of these circumstances. When an officer is confronted by three drunk individuals on a dark, dead-end street, when he has reasonable suspicion to detain all three of them to investigate, and one of those individuals approaches him apparently aggressively, it is objectively reasonable for that officer to draw his weapon and order the three individuals to sit in order to freeze that scene until uniformed officers can come and complete that investigation. Additionally... Does it matter the manner in which he uses, displays, or I'm not sure what the right word would be. I mean, his testimony, he's holding the weapon down. The testimony from the others is quite the opposite. Does the manner in which he uses the weapon make a difference in our analysis? Certainly, the aggressiveness of the display of the weapon does contribute to the analysis, and for these purposes, we must accept Mr. Rutherford's testimony that there was active pointing of a firearm. And I'm afraid the testimony of the others? That is correct. There's some back and forth on that, but yes. But all the testimony unfavorable to your client, at this stage, we've got to believe. That is correct, Your Honor. However, that sole issue is not dispositive of this inquiry. As courts have repeatedly recognized when considering the scope and duration of a terrorist stop and what factors caused that to become a, per se, arrest, the courts have stressed that you do not use a divide-and-conquer approach to this. You do not look at any one single factor. You look at the totality of the circumstances. In the Washington v. Lambert case, the court did look at some factors that courts have considered in the past to make these determinations, but courts consider a variety of things, including was it dark, was the officer outnumbered, were the officers reasonably pursuing their investigation and doing so expediently, as well as the factors that were outlined in Lambert. Under that analysis, when you look at the totality of the circumstances, in this case, Officer Chinn's actions were reasonable. Even if Officer Chinn's actions technically violated the Constitution by ceding that hazy border between a terrorist stop and a custodial arrest, there is no case on point that would give clear guidance such that every reasonable officer would know that Officer Chinn's actions would exceed the Constitution and put that issue beyond debate, and that is the standard as articulated by the United States Supreme Court in Elkid. So what do we know about intrusive measures? We've received criticism from the district court and from Mr. Rutherford that we are too focused on these two intrusive measures, the order to sit and the display of the firearm. In looking at that hazy border between a reasonable suspicion, excuse me, between a terrorist stop and an arrest, there are only certain invasive intrusive measures that can convert between the two, and courts have focused not on the individual measures, but on whether the officer is using reasonable methods to ensure their safety. This is at the core of all the cases that have been cited to this court. In fact, the entire reason for such a fact-based, complex, doctrinal scheme is to take into account the legitimate safety concerns of law enforcement. So in this particular case, what were those concerns? Officer Chinn was alone. It was a dark, dead-end street. He was outnumbered. When he emerged from his car, and we've submitted the 911 recordings of this. I don't know if the panel's had an opportunity to examine that. He comes out of his car. He clearly identifies himself as a Seattle police officer, and he orders Mr. Thant to come over to him because Mr. Thant is walking towards a house. Mr. Thant does respond to that order, but when he approaches, he approaches very aggressively. At least that is the way it appeared to the officer. Yeah, but that's not the testimony of the witnesses against him. Well, interestingly enough, neither Mr. Rutherford nor Mr. Alfonso actually saw the approach. When they first observed Officer Chinn, Mr. Thant already had his hands on Officer Chinn's vehicle. So we have no testimony except for Mr. Chinn's testimony as to the manner of the approach? Correct, and a little further, Mr. Thant admits that he did approach, and that he continued to approach even after he was ordered to stop. Mr. Thant, however, does not actually remember being put onto the hood of the car and frisked. We presume that's due to intoxication. It's an anomaly. Both Mr. Rutherford, Mr. Alfonso, Officer Chinn admit that that happened. What's important to notice, though, is that the intrusive measure of drawing the firearm only occurred in response to Mr. Thant's approach. Something happened, and if you listen to the 911 calls, you'll hear Officer Chinn talking. He disconnects. That's because he has his badge in one hand, he has his cell phone in the other. He disconnects, draws his weapon only at that point. He does not come flying out of his car initially with his gun drawn, barking orders. It was a far more moderated approach initially. Then when confronted with a specific threat to his safety, as he perceived, and I want to stress, this is a qualified immunity case. Officer Chinn is entitled to make mistakes of fact and mistakes of law. He is entitled to misperceive the level of aggressiveness of Mr. Thant's approach. Even if there were testimony to the contrary, if that's how it appeared reasonably to Officer Chinn, he's allowed to respond to that. So the drawing of the weapon is only in response to a specific perceived threat to his safety. At that same time, Mr. Alfonso and Mr. Rutherford also approach. They, turning, seeing their friend on the hood of a car, they respond. The testimony was urgently. They weren't running, but they were certainly moving with conviction. It is at that point that the officer, confronted with a non-compliant Mr. Thant and the approach of two other individuals, who he perceives to be intoxicated, and in fact they were, orders all three of them to just sit. And if you listen again to the 911 recordings, at that point he recontacts dispatch. When he does that, you can hear in the background these three individuals. They're yelling, they're vocalizing, there's a lot of back and forth, and Officer Chinn remains professional and moderated throughout this entire event. He is explaining, please sir, remain on your bottom, just have a seat by your friends. He repeatedly instructs them to stay in a seated position while he is communicating with dispatch and trying to arrange for other officers to arrive on scene. Can I ask a factual question? There's a document in the record, I don't know how it got used. It's the report of discipline about Mr. Chinn from the department files, March 15, 2008. Technically this was not discipline, this is... Well, whatever you call it. Sorry to parse it, but it's what's called a supervisory intervention. Yeah, I know. It was on a police commission, so I'm familiar. In any event, I'm not trying to pin you down on the nature of it, I'm just trying to describe it. Okay, and it says it's a memorandum and it's from the Office of Professional Accountability. Was that presented to the jury? I do not believe that document was presented to the jury. So it is not something that is to be considered in connection? It certainly was considered by the court. On the question of qualified... And also on the issue of fees. Okay, yes. So the commentary on the second page, it's for SPD 428, has this statement that the concern both the UOPA auditor and I have with regards to the legal justification Chinn had to require all three occupants to sit down on the ground detaining them, even assuming that he was fearful for his safety, as Mr. Rutherford walked toward him, it is not at all clear that Chinn had reasonable suspicion to detain the others. It turned out that Alfonso was the car driver, he was subsequently charged, and so on. However, Chinn's decision to initially take on the incident alone, a questionable use of discretion, led him to unnecessarily and without justification detain all three occupants and contributed to the escalation of the situation with regards to Mr. Rutherford, and it says, recommended that the department consider a training review with regards to Terry's stop requirements. So, if that's the case, it sounds like, at least to these folks who were his peers in some sense, that it should have been obvious to a reasonable officer that he was going beyond the limits of Terry. Your Honor, the finding of the OPA was that there certainly were some concerns about his behavior. They did not sustain any of the allegations against him, and they recommended that he be referred to a supervisor to discuss his options. This was not a finding that he violated the Constitution, it was not a finding that he violated SPD policy, because he actually did neither. In this case, the district court found there was reasonable suspicion to detain all three of these individuals during this Terry stop as a matter of law. In fact, at the summary judgment stage, the court granted qualified immunity to Officer Chinn for the entire unlawful detention claim, which was dismissed at that point and later resurrected before the case went to the jury, in this narrow piece of the scope and duration of that Terry stop. But the reasonable suspicion is not at issue. Speak to me, if you would, about the duration. Can we extract from the record, 911 calls, etc., a reasonably approximate length of the duration from the moment the officer alights from the vehicle to the moment that the reinforcements arrive? How long did that take? Well, what we have are two 911 calls. The duration of those two, I believe, is just under four minutes. There's likely some period of time that occurred between those two, but we don't know what it is. There was no testimony, and certainly there was no testimony of any delay at the period of time when Mr. Fant was on the car. So our approximation is somewhere in the four to five minute range. Four to five minute range between his initially getting out of his car and reinforcement comes? Correct. And the way we calculate that is looking at the 911 calls. We know... The total with the break? Correct. The total... Again, it could be a matter of a few extra minutes in there. It could be seven. It's speculation, but... Because it looked like it said four minutes on one and three on the other. I don't... There's a period of time where Officer Chin is actually talking with dispatch. He's not on the scene. I see. Yes, that of course is true. Are you able to hear the approaching reinforcements on the second 911 call? The point you know from what we know about this case is there's a point in time on that 911 call where you hear Officer Chin yelling, sit down, sit down, sit down, in a very agitated voice. That is the point when the reinforcements are coming and Mr. Rutherford is running for it. And it's clear from the first call that that began while he was on... I should say before he actually had the encounter. So we can mark the time from the beginning of the encounter more or less accurately and then compute on the basis of the second call an approximate duration of the period. That's correct, Your Honor. Now before you sit down, could you address briefly the fees issue? Assume for purposes of my question that we disagree with you on qualified immunity. I'm certainly not asking you to concede your position away, but assume that for purposes of the question that the jury and the district court properly found no qualified immunity. Could you address the fees issue? Certainly, Your Honor. As you well know, in Mahak Watkins, the circuit established the three-part test relying on Justice O'Connor's concurrence in Farrar. Looking at the three points there, clearly there's a huge discrepancy between what was sought and what was awarded in this case. He originally asked for $3 million. To the jury, he asked for $300,000. He was awarded zero. And as a matter of law, that was elevated to a dollar that could have as reasonably been elevated to a penny. It is simply a number up to it, a dollar. So clearly that weighs against Mr. Rutherford. The second point as to whether this is a significant claim. We do not in any way intend to disparage the Fourth Amendment and that it is a significant claim. We don't believe that's the analysis. The analysis is what right did he vindicate in these circumstances? And what we have here is we have a lawful detention based on reasonable suspicion. Subsequent to that, we have a lawful arrest supported by probable cause. We have a lawful use of force. That's where we ended up. In between the Terry stop, the lawful detention, and the lawful arrest, there is a questionable period of time. That is what the jury found, that the scope and duration was exceeded. We all know that Farrar was a civil rights case. It involved constitutional issues. The very fact that this involves constitutional issues can't be enough to elevate the second prong. Justice O'Connor was very articulate with this, where she said that Mr. Farrar had won a point, but game, set, match went to the defendants. That's what we have here. He vindicated a technical issue in between lawful detentions. And on the third, the question of whether there's a collateral benefit or a lesson that can be learned here. My understanding of the way courts apply this is they look to whether there was actually a collateral effect achieved or a set of facts from which a lesson can be learned. That would be the Guy v. San Diego case. In this instance, neither Mr. Rutherford nor the district court has been able to articulate what exactly Officer Chin did wrong. We're the ones that are analyzing the use of the gun and the use of ordering the three individuals to sit. Beyond that, there's no lesson to be learned here. And the court's instruction that this case serves as a lesson as to the authority of off-duty officers and their contact with citizens, that is a non-constitutional issue. If that is the lesson to be learned from this case, that goes far beyond the issues that were properly before the district court. Thank you. Let's hear from the other side. We took you over. We will give you a chance to respond. Thank you. Good morning. May it please the court. My name is Sarah Berry, and I'm counsel for Plaintiff Andrew Rutherford. Mr. Rutherford requests that you do two things with this appeal. First, he would like Mr. Rutherford like you to affirm the court's order denying qualified immunity, and second, to affirm the district court's order awarding attorneys fees. We kind of suspected that. Just to be clear, in case anyone had doubts. Turning to the issue of qualified immunity, the district court's denial is reviewed de novo. However, as this court has already pointed out, that decision must be, the facts must be considered in the light most favorable to Mr. Rutherford, and the inferences must be drawn in support of the jury verdict in this case. The jury concluded that off-duty Officer Chinn's conduct was unreasonable. The city has not challenged the jury instructions or the jury's verdict in this case. Now, instead, the city is arguing that the totality of the circumstances do support Officer Chinn's decision to draw his weapon in order for these three men to sit in the street while he investigated traffic violations that had concluded. However, as the city has done throughout this case, they continue to parse the facts to focus only on the drawing of the weapon and ordering the men to sit. Those are not the totality of the circumstances. The city continues to argue that there is no clear law on whether or not Officer Chinn's conduct was reasonable, and that's simply not the case, as the city recognizes Washington versus Lambert described special circumstances under which an officer can heighten an investigatory detention, can use especially intrusive means to accomplish that detention. Now, those factors are certainly not exclusive. However, those factors have been used previously in cases prior to Washington versus Lambert, and they have been used since then. You know what would be the most helpful to me is if you'd kind of do the opposite of what your opposing counsel did. Tell us with respect to the case here in front of us, what are those facts? Absolutely, Your Honor. I'm less interested in the other case law than I'm interested in, okay, what's the evidence here that favors your position? To start with, the three men were not uncooperative. They were not trying to flee. Mr. Thant was approaching Officer Chinn's direction when Officer Chinn called him towards him. Mr. Thant complied. Now, we have to focus on Mr. Rutherford's conduct because Mr. Rutherford is the one who brought this lawsuit. When Mr. Rutherford noticed that his friend, Mr. Thant, was swayed on the front of a vehicle, just an everyday sedan, he started to walk towards his friend. At that point, Mr. Rutherford had not been uncooperative in any way. However, Off-Duty Officer Chinn pointed his gun at Mr. Rutherford at that point in time. No uncooperative conduct. He pointed his gun at Mr. Rutherford and ordering him to sit. Mr. Rutherford complied. Is that your point of no return? Once that weapon is pointed, if I were to ask you, at what point in this series of events was the constitutional line crossed? Could you answer that? And what would it be? Because we have to, we're expecting the police officer to be able to say the same thing to himself. Correct. I would say that because he did not give Mr. Rutherford an opportunity to comply prior to pointing his gun at him, yes, the pointing of the gun and ordering him to sit, considering all of the circumstances at that time, that is the point at which Officer Chinn crossed the line. I have difficulty reconciling the jury's verdict, and I know the issue wasn't before specifically, on the false imprisonment account, given the instruction that the court gave, with their verdict on this account. With respect to the false imprisonment, the court focused the jury only, and I quote, only on the events that transpired after Defendant Chinn ordered plaintiff to the ground in their initial confrontation. So on that charge, the jury found in favor of Officer Chinn. How do we reconcile these two? Because then, the count in question obviously deals with the period before he was ordered to the ground. It was a proper stop, according to the court. I assume he can get out of his vehicle at some point. So at some point, when he gets out of the vehicle, but before he orders them to the ground, your view is the constitutional line was crossed. I have difficulty with that. Your Honor, the way I see it, the first count looked at the time from when Mr. Rutherford and his two companions exited their vehicle, when Mr. Rutherford got up out of the street to avoid the oncoming police cars. So it looks at a broader spectrum of time. The totality of those circumstances, and whether or not Officer Chinn's conduct was reasonable in detaining Mr. Rutherford and completely eliminating his liberty of movement, it's a broader time frame than the unlawful arrest, I think it was that you said. So it's not as narrow of a view the jury is considering more circumstances and more facts. In this totality of the circumstances for the count on which the jury found in favor of Mr. Rutherford, they're considering not only was Mr. Rutherford cooperative or not, they're considering whether or not there was a violent crime that had been committed, whether a violent crime was imminent, and was anyone armed. And based on the facts in this case, which are viewed in favor of Mr. Rutherford, we must answer no to all three of those questions. We know that Mr. Chinn was investigating traffic violations that had ended. There was no crime imminent. There was no indication of any, there was no crime happening at the time, and nothing was imminent. Well, are we to ignore what comes across on the 9-11 calls, that he's been trailing these guys and they're weaving all over the streets and throwing stuff out of the car. He's reporting them in a conscientious manner. To the dispatcher and describing what's going on. And he's identified them as, what the court found was reasonable suspicion of drunk driving. They're now at the end of a cul-de-sac on a dark street, and he is out of uniform and he is in his own car, so that cuts for and against. They don't know he's a cop from his clothing or his car, but they do know he's a cop because he's yelling at the police. I guarantee you I'm police. I'm not jacking you and that kind of thing. So, I'm having a little trouble. I understand that the jury looked at all of this and faulted and found him guilty of crossing the line as far as their view of it was concerned. But the question is, on qualified immunity, where does Chin look to guidance to say, I've got three guys, I'm outnumbered. They're obviously, in his view, inebriated, at least one of them was. And he's trying, and you can hear him trying, to get them to stay put. And he's responsibly called back up. So, I'm looking for the teachable moment in this case myself. Off-duty cops are not off-duty in the sense that they don't have law enforcement obligations. They're licensed to carry weapons and enforce the law 24-7. So, it seems that he acted responsibly in that sense. There's nothing in the 9-11 calls that indicates that he's doing anything other than calmly, I try to envision myself with tracking somebody, just trying to be a good citizen and being on the phone. I'd be really not very calm and collected, I don't think. But in any event, now, I understand we have to give all deference to the jury and take the facts most negatively to Chin. But, counsel has gone through and done that. And I really am having trouble saying this is something you're going to go to police departments around the 9th Circuit and say, off-duty cops, if you're chasing a DUI and you're outnumbered three to one in this dark street, you better not pull your gun if they start moving towards you. That's, that seems to me a bit of a stretch. And I have to just, one other thing that affects me is that the jury, apparently erroneously, was given an instruction that said you may, instead of you must, award compensatory damages. Or, not compensatory, but nominal damages. And they chose not even to do that. They acquitted him on one count or two counts and they got him on one and they didn't see any reason to send any kind of signal when they had the opportunity to do so in terms of nominal damages. So, I'm having trouble seeing why this is a clear, clearly established violation of law. Your Honor, turning to the first part of your question. This is a long question. It's quite all right. We don't ignore what Officer Chin was observing while they were driving. What he observed was reckless driving. He had a reasonable suspicion that the driver might have been intoxicated. He had no way of saying conclusively that yes, the driver was intoxicated. Right, otherwise, yeah. So, we're, we grant him the fact that yes, there was reasonable suspicion to conduct a Terry stop. However, he was off-duty. Seattle Police Training indicates that when you're off-duty, you should not actively engage in the investigation unless there are, is a life-threatening crime in progress or some sort of significant issue happening. Why do you say investigation? All he was doing was stabilizing the situation, wasn't he? He had backup coming. He did have backup coming, so he could observe and report back to dispatch. He actively engaged the situation once he got out of the car. So, he should have stayed in his car? Is that the teachable lesson of this case? It is one of the teachable lessons, I believe, based on... So, his best policy, he should not have gotten out and told them to stay where they were. I wouldn't say that in every circumstance he should not have gotten out of his car, but in this case, that is part of, to the extent that you're saying what was good police practice or wise police practice or what the police department thinks an officer should do and so on, because very often the police department will be directing its officers out of the exercise of prudence and in the exercise of good police practices. And we're not talking here, or at least not necessarily talking here about violation of the Constitution. I mean, there are all kinds of things that police officers are told to do by the departments that really have nothing to do with constitutional violations. So, the mere fact that maybe good police practices might have been otherwise, that doesn't get you all the way where you need to get. I understand your point, Your Honor. And when you consider the fact that he was not necessarily following good police practices, you combine that with the rest of the circumstances in this case, the fact that no one was armed, it's not like they were sitting inside a car where weapons could have been easily reached. They were not visibly armed. Officer Chinn had no reason to think they were armed. The three men, Mr. Rutherford specifically, were cooperating with Officer Chinn's instructions. There were no crimes of violence that had occurred, as I said previously. It was all traffic violations that had concluded by that point. No crime of violence was imminent. And according to the testimony of Mr. Alfonso and Mr. Rutherford, both testified that the gun was pointed at them, pointed towards them. It was not being held at a low ready position. It was not down by Officer Chinn's leg. It was being pointed at them. So the worst that we can say about Officer Chinn's conduct is that he pointed a gun at Mr. Rutherford and Mr. Rutherford's friend. Of course, he never discharged the gun. Correct. He used the gun as a coercive device to get them to sit down. Correct. Mr. Rutherford's hurt a little bit later, but this is not by Officer Chinn, it's by somebody else. And that time period is not before the court in this appeal. So really what we're talking about is was it a violation of the Constitution to point the gun at Mr. Rutherford under these circumstances, or was it a violation that a reasonable officer should have known it was a violation? Correct, Your Honor. Because of the total circumstances in this case. The total circumstances. See, that's it. We spend all this time in lawyers and you do a very good job of it marshalling these facts and weighing them on both sides of the particular question. We have a police officer in an acute situation and we have to find a clearly established right. You wouldn't want to send the message that under no circumstances may a police officer confronting three unknown suspected criminals draw his weapon. You wouldn't want to have that as the clearly established constitutional right, would you as a matter of policy? As a matter of policy, I would not say that. But that's the clearly established right that he's apparently violated. The clearly established right that he is violating here is the ability to detain a cooperative, non-violent suspect of traffic violations. You see traffic violations. They were traveling on I-5 at a high rate of speed, cutting across lanes. These are not minor traffic violations, you know, but for a circumstance here or there, it could be a felony case. The idea is, I know second-guessing sounds a little cheap, but I don't mean it that way. We're expecting the officer on a scene to be able to make a judgment as to what is clearly permitted and not permitted. And although he may have made a misjudgment in terms of better police practices, the message we're saying otherwise is, don't get involved. Don't draw your gun, thereby putting you in a given situation, perhaps putting yourself in jeopardy, we all know about that, those sad circumstances, or don't get involved. Those are the messages that are being sent here. If I may answer your question within there, Your Honor, the message that we're sending here is that unless there are, the officer has specific reasons to believe that his method of detention is required, such as the suspects being uncooperative, crimes of violence, the suspects being armed. When you say they were being cooperative, at least on the 9-11 call, he's saying sit down, stay, sit, sit, no, stop. So in what he was trying to do to stabilize things, they were not cooperating. According to Mr. Rutherford's testimony though, once he sat down, he stayed sitting down until the later point in time when the police recusers were approaching. Well he was talking to somebody because it's on, you know, sit, sit, no, sit. But it's not clear who he's talking to and no one testified that they were bouncing up and down, that they were getting up and sitting back down. Would your honors like me to address the issue of attorney's fees? I'm okay on attorney's fees. Okay. Thank you very much. Thank you. Do I have two minutes to respond? Very briefly, your honor. Judge Fisher, I think your question is what case can Officer Chin look to for guidance in this particular set of circumstances and I really do think that's one of the core questions here. There is no case that puts this set of circumstances and his actions beyond debate as is required. There's a focus on the Lambert case. The Lambert case is an outrageous case. There wasn't reasonable suspicion in that case and the level of intrusion was extreme. Multiple officers pointed weapons, pulled these guys out of a car, handcuffed them, sequestered them in separate vehicles and detained them for a period of up to half an hour. And in the analysis in the Lambert case, this court stressed there's an and before each one of those intrusions. In this case, we have two that we can identify. The use of the gun and the order to sit. Contrast that to the Galagos case in which the individual was stopped while he had been breaking into a home. Again, non-violent crime. No evidence that he was armed. Burglary is not the type of crime that you would expect someone to be armed in. Certainly, there's no case on that point. There was no violent crime that was about to occur. None of those Lambert factors that are being touted in this case were used. Instead, that court's decision turned solely on whether the officer was pursuing a reasonable means of advancing his investigation. That's what Officer Chin was doing. He was freezing the scene so that the investigation could occur.  the case on point is Serna-Baretto out of the Seventh Circuit. This is one of the two cases before this court where the officer was alone. There, the court recognized that it was prudent for that officer to approach multiple suspects with the gun drawn. One of the cases cited in Serna-Baretto is U.S. V. White at 648 F2D 29. In that case, that's a D.C. Circuit case out of 1981, that court grappling with multiple officers' use of a firearm during a stop, said, though this case would be easier if it involved a dark and deserted spot or one lone officer facing a car full of suspects, our reluctance to second-guess the judgment of experienced officers is not limited to such extreme situations. Therefore, in the eyes of that court, this case clearly would fall within qualified immunity. Thank you, Your Honor. Thank you very much. Thank you, Bob. Good, clean, thoughtful arguments. Thank you. Rutherford v. McKissack and Chin, now submitted for
judges: Dearie, Fletcher, Fisher